## MARLAND OIL CO. OF TEXAS v. MOORE et al. (No. 8983.)

Court of Civil Appeals of Texas. Galveston. May 7, 1927.

Rehearing Denied July 23, 1927.

**Mines and minerals ⬾74—Assignment of oil leases subject to contemporaneous contract held not to pass title, and assignee's failure to reassign did not bind it.**

Contract of assignment of oil leases, being subject to terms and conditions of contemporaneous contract as to exploration of lands, *held* not to have vested title in assignee, where contract expressly provided that assignee on or before four months from date thereof could elect to purchase the leases, and hence the negligent failure of assignee to comply with covenant to reassign leases on or before date named could not have effect of binding it to contract of purchase which it never intended to make.

Appeal from District Court, Harris County; Chas. E. Ashe, Judge.

Suit by W. C. Moore and another against the Marland Oil Company of Texas. From a judgment for plaintiffs, defendant appeals. Reversed and rendered.

Baker, Botts, Parker & Garwood, of Houston, for appellant.

A. D. Dyess and Bryan, Colgin, Suhr & Bering, all of Houston, for appellees.

PLEASANTS, C. J. This suit was brought by appellees, W. C. Moore and L. H. Dunn, against appellant, to recover the sum of $60,000 alleged to be due them under a contract of sale by appellees to appellant of oil, mineral, and gas leases owned and held by appellees upon lands in Wharton county. The contract upon which the suit is brought was executed May 15, 1925, and, after describing the leases contracted to be sold, contains the following provisions:

"Whereas, said leases and all rights thereunder or incident thereto are now owned by L. H. Dunn and W. C. Moore:

"Now, therefore, for and in consideration of the sum of ten and no/100 ($10.00) dollars, and other good and valuable considerations, the receipt of which is hereby acknowledged, the undersigned, the present owners of the said leases and all rights thereunder, or incident thereto, do hereby bargain, sell, transfer, assign and convey all rights, title and interest of the original lessee the present owners in and to said leases and rights thereunder in so far as it covers the lands described above, except * * * (here follows the description of excepted tracts), together with all personal property used or obtained in connection therewith to the Marland Oil Company, of Texas, its successors and assigns, excepting from this assignment and reserving unto L. H. Dunn and W. C. Moore as royalty, in addition to the royalty provided to be paid to the lessor, or lessors, under said leases one forty-eighth (1/48) part of all oil produced and saved from said leasehold estates above described and covered by this assignment; and one-fourth (1/4) part of the net proceeds derived from the sale of gas produced and saved from and marketed on said premises under the oil and gas mining leases covered by this assignment; and one twenty-fourth (1/24) part of the net proceeds derived from the sale of other minerals (except sulphur) produced and marketed from said leasehold estates covered by this assignment; and the sum of fifty cents (50¢) per ton of two thousand two hundred forty (2,240) pounds on all sulphur marketed from the leasehold estates above described and covered by this assignment; and reserving unto the Union Sulphur Company, as royalty, in addition to the royalty provided to be paid to the lessors under said leases one forty-eighth (1/48) part of all oil produced and saved from the leasehold estates above described and covered by this contract.

"And for the same consideration the undersigned, for themselves, their heirs, successors and assigns, do covenant with the said Marland Oil Company of Texas, and its successors and assigns, that they are the lawful owners of said leases and the rights and interests thereunder and of the personal property thereon or used in connection therewith; that the undersigned have good right and authority to sell and convey the same, and that said rights, interests and property are free from all liens and incumbrances and that all rentals and royalties due and payable thereunder have been duly paid, and that the undersigned will warrant and defend the same against the lawful claims and demands of all persons whomsoever.

"It is expressly understood and agreed, however, by and between the Marland Oil Company of Texas and L. H. Dunn and W. C. Moore, that this assignment is subject to all the terms, conditions, covenants, and agreements set forth in a certain contract made and entered into by and between the said parties on the 15th day of May, 1925.

"The covenants and obligations herein contained shall be construed as covenants running with the land and shall be binding upon the immediate parties hereto, their heirs, successors and assigns."

The contract executed contemporaneously with the assignment contained the following pertinent provisions:

"This agreement, made and entered into this 15th day of May, 1925, by and between W. C. Moore and L. H. Dunn, both of Houston, Texas, hereinafter designated parties of the first part; and the Marland Oil Company of Texas, a corporation duly organized and existing under and by virtue of the laws of the state of Delaware, and doing business in the state of Texas under permit duly issued by the state of Texas, of Houston, Texas, hereinafter designated party of the second part, witnesseth:

"Whereas, parties of the first part are the owners and holders of certain oil and gas mining leases and leasehold estates covering lands situated in the county of Wharton, state of Texas, described as follows, to wit (here follows the description of lands):

"Now, therefore, for and in consideration of the sum of ten and no/100 dollars ($10.00), paid by each of the parties hereto to the other, the receipt of which is hereby acknowledged, and the further consideration of the faithful performance of all the terms, conditions and agreements hereinafter set forth on the part of the respective parties hereto to be kept and performed, it is agreed by and between the parties hereto, as follows, to wit:

"1. Parties of the first part agree to use their best efforts to furnish, for examination, abstracts of title, brought down to date, showing good, valid and merchantable title to the oil and gas mining leases hereinabove described, vested in parties of the first part. Party of the second part agrees to have said abstracts of title examined by its attorneys, and agrees to render to parties of the first part a written list of all the requirements found necessary, in the opinion of the attorneys for party of the second part, to perfect title to said oil and gas mining leases in parties of the first part. Parties of the first part agree, to the best of their skill and ability, to secure the requirements found necessary by attorneys for party of the second part, to perfect title to said oil and gas mining leases in parties of the first part; and party of the second part agrees to co-operate with par-

ties of the first part in curing any defects in title to the said oil and gas mining leases above described.

"2. Parties of the first part agree, upon the execution of this contract, to make, execute and deliver unto party of the second part good and properly executed assignments, covering all the right, title and interest of parties of the first part in and to said oil and gas mining leases and leasehold estates hereinabove described, reserving unto said W. C. Moore and L. H. Dunn as royalty, in addition to the royalty provided to be paid to the lessors under said leases, one forty-eighth (1/48) part of all oil produced and saved from said leasehold estates above described and covered by this contract; and one twenty-fourth (1/24) part of the net proceeds derived from the sale of gas produced and saved from and marketed off said premises under the oil and gas mining leases covered by this contract; and one twenty-fourth (1/24) part of the net proceeds derived from the sale of other minerals, except sulphur, produced and marketed from said leasehold estates covered by this contract; and the sum of fifty (50¢) cents per ton of two thousand two hundred forty (2,240) pounds on all sulphur marketed from the leasehold estates above described and covered by this contract; and reserving unto the Union Sulphur Company, as royalty, in addition to the royalty provided to be paid to the lessors under said leases one forty-eighth (1/48) part of all oil produced and saved from the leasehold estates above described and covered by this contract.

"3. Party of the second part agrees, upon the execution of this contract by all the parties hereto, to pay to the parties of the first part the sum of two thousand and no/100 ($2,000.-00) dollars cash; and party of the second part agrees, on or before four (4) months from the date hereof, to make and complete, at its sole and entire cost and expense, a geological survey of the lands covered by the leases above described, and agrees to employ, in such geological survey and investigations, the use of a seismological apparatus so as to make a reasonably thorough geological exploration of said lands. Party of the second part may also employ other improved processes for gaining geological information with reference to the existence of minerals in and under said lands covered by said leases.

"4. Parties of the first part agree to secure from the various lessors named in the oil and gas mining leases above described, written consent, consenting to the use by party of the second part of its seismological apparatus on said lands, and further granting to party of the second part the right to go upon said lands and explode dynamite thereon in connection with its seismological apparatus.

"5. Party of the second part agrees to reimburse parties of the first part for all moneys paid by parties of the first part to the respective lessors under said oil and gas mining leases for delay rentals which became due and payable under said leases on May 2, 1925.

"6. It is further agreed by and between the parties hereto, that after party of the second part shall have completed its geological survey of the lands above described, as hereinabove provided for, and on or before four (4) months from the date hereof, party of the second part shall have the right, privilege and option to

elect whether or not it will retain the ownership of said oil and gas mining leases; and, in the event that party of the second part should elect to retain the said oil and gas mining leases, then, in that event, party of the second part agrees to pay to parties of the first part the sum of twenty-five thousand and no/100 ($25,-000.00) dollars cash in addition to the two thousand and no/100 ($2,000.00) dollars cash consideration hereinbefore specified; and, in addition to the payment of the said twenty-five thousand and no/100 ($25,000.00) dollars cash, party of the second part agrees that it will, on or before ninety (90) days after the expiration of the four (4) months' period above specified, commence operations for the drilling of a test well for oil and gas mining purposes on the lands above described, and drill said test well with due diligence and dispatch, and without unnecessary delay, to a depth of at least three thousand (3,000) feet, unless cap rock or salt is encountered at a lesser depth in the said test well, or unless oil or gas is found in paying quantities in said test well at a lesser depth.

"In the event that party of the second part shall elect not to retain its interest in and to said oil and gas mining leases after the completion of its geological survey of the lands covered by said leases, then, in that event, party of the second part shall, within the four (4) months' period above specified, reassign and reconvey unto parties of the first part, all of its interest in and to the oil and gas mining leases and leasehold estates above described and thereupon be relieved from further liability thereunder.

"7. It is further agreed by and between the parties hereto that, if by reason of the explorative work done by party of the second part, either by drilling or by the use of the seismological apparatus and/or the torsion balance, party of the second part shall deem it necessary, and does, secure oil and gas mining leases covering additional acreage outside of the block of acreage covered by the leases above described, in order to protect the interest of party of the second part, then in that event, party of the second part agrees to assign and convey unto parties of the first part, as royalty, in addition to the royalty provided to be paid to the lessors under the additional lease thus acquired, one twenty-fourth (1/24) part of all oil, gas and/or other minerals, except sulphur, produced, mined and saved from the lands covered by the additional leases thus acquired, and located within two miles of the boundary lines of the block of acreage covered by the leases first hereinabove described; and, in the event that parties of the first part do acquire, either in their own names or in the names of any person, persons, firms or corporations, other than the party of the second part, such additional oil and gas mining leases, then in that event, parties of the first part agree, upon demand, to assign, transfer and convey unto party of the second part such oil and gas mining leases thus acquired by parties of the first part, at the actual cost of such oil and gas mining leases to parties of the first part.

"This agreement shall extend to and be binding upon the heirs, executors, administrators, successors, and assigns of the parties hereto."

Plaintiffs' petition, which sets out the contract above copied, alleges in substance that

plaintiffs furnished abstracts of title to the defendant, and that the titles were examined and approved by the defendant, and that pursuant to the contract plaintiffs executed and delivered certain assignments transferring their interest in certain leases described in the contract to the defendant, with reservations to the plaintiffs of certain overriding royalties in the oil, sulphur, and gas. It was also alleged that the defendant oil company paid the plaintiffs $2,000, referred to in the contract, and reimbursed the plaintiffs for certain delayed rentals which became due under the leases on May 2, 1925. The petition also alleges that the defendant did make a geological survey of the lands described in said leases.

The petition then alleges that the defendant wholly failed and refused to comply with the requirements and provisions of paragraph 6 of the contract, in that the defendant wholly failed to pay the plaintiffs $25,000 cash, and wholly failed to commence operations for the drilling of a test well, as provided in paragraph 6 of said contract. The petition further alleges that not until the $25,000 became due and not until after the defendant's obligation to drill the well had fully matured did the defendant notify the plaintiffs of its election not to retain said leases, and not until September 24, 1925, did defendant tender to plaintiffs a reassignment of said leases, which the plaintiffs refused to accept. The petition then alleges that time was of the essence of the contract and alleges in substance that defendant, in order to escape liability for the $25,000 and the liability of the obligation to drill the well, must have actually reassigned the leases prior to September 15, 1925. It is then alleged that the cost of drilling such a well as provided in paragraph 6 of the contract would be $30,000, and the petition concludes with a prayer for judgment in favor of the plaintiffs against the defendant for $60,-000.

The appellant answered by general demurrer, special exceptions, and general denial, and further specially pleaded that during the month of July, 1925, it caused the land described in the leases and in the contract to be thoroughly explored with a seismograph under the supervision of one Weigelt, who had had many years' experience in the operation of such an instrument; that the plaintiffs kept themselves well informed of the progress of the geological test and knew approximately when the test and survey began and when it ended; that the said Weigelt made his report to the Oil Company on or about August 1, 1925, which report showed in substance negative results and the nonexistence of any salt dome on the land and the nonexistence of any oil-bearing strata thereon or therein.

The answer further alleges that shortly after the completion of said geological survey and test, P. S. Moore, duly authorized agent of the plaintiffs, inquired by telephone of the oil company what the result of said geological explorations was, whereupon he was then advised by the oil company's vice president, Alexander Deussen, that the result of the geological test and seismograph operation was wholly negative and failed to indicate the existence of a salt dome or the probable existence of oil-bearing strata and that the Marland Company had decided to surrender the leases and would reassign them to the plaintiffs; that when the said P. S. Moore was tentatively advised as to the result of the explorations of said land, he stated to the oil company's vice president that he was sorry and hoped they (meaning the plaintiffs and intervener) would have better luck next time. The answer then alleges that P. S. Moore communicated to the plaintiffs the substance of his conversation with the oil company's vice president prior to September 15, 1925, and that the plaintiffs well knew and understood that the oil company had elected and decided to reassign the leases and not to pay the $25,000 and not to drill the well.

The answer then alleges that, through a mistake in the oil company's legal department, the contract was not sent to the land department to be card indexed showing the date when the money should be paid or a reassignment made, so that the land department could, according to the well-established custom of the defendant oil company, a substantial time prior to September 15, 1925, call the matter to the attention of the defendant's vice president; that for this reason, and due wholly to oversight and possible negligence on the part of the oil company's legal department, the matter of actually delivering the reassignments to the plaintiff was not called to the attention of defendant's vice president until on or about September 15, 1925, and that within a few days thereafter the actual reassignment was delivered to the plaintiffs, who still have the instrument. The answer then sets out in substance that all of the plaintiffs well knew and understood after the telephone conversation between P. S. Moore and Alexander Deussen that the oil company had decided not to retain the ownership of said leases and not to pay the $25,000 and not to drill the well, but had definitely decided and elected, and had communicated said decision to the plaintiffs, to reassign the leases and have no further operations under the contract; that the plaintiffs well knew after the occurrence of said telephone conversation that at any time by a simple request they could secure from the defendant a reassignment of said leases.

The answer then alleges that the plaintiffs, including P. S. Moore, who subsequently intervened in the case, claiming one-sixth interest in the contract, had each been in the oil business many years, were experienced

and practical oil operators and thoroughly familiar with the seismograph, and well knew that dry holes had been drilled on these lands, and that unless the seismograph test should develop the probable existence of a salt dome the oil leases were wholly worthless and of no market value whatsoever as such; that the plaintiffs and defendant well understood that the contract entered into was purely a tentative one for the purpose of having the oil company explore the land and discover the probable existence or nonexistence of a salt dome, and well knew that unless the probable existence of the salt dome was reflected by the seismograph, the oil company would in no event be interested in paying and would not pay $25,000 for worthless leases and incurring obligations to drill a well.

The answer concludes by averring in substance that if there was any breach on the part of the oil company of its covenants to reassign said leases and deliver said reassignment on or about September 15, 1925, then the defendant admits it is liable for said breach of covenant and is willing to pay plaintiffs for such breach any damages which they may have sustained thereby, but also avers that there was no damage to the plaintiffs because said leases were wholly worthless.

The trial of the case was before a jury. At the conclusion of the testimony the court held and ruled that the provisions of the sixth paragraph of the contract required the appellant to actually reassign and reconvey all interest in the leases in question before the expiration of four months from the date of the contract, and the failure of the appellant to so reassign and reconvey same fixed and determined the rights of appellees and left nothing for determination except the question of the cost of drilling a well to the depth of 3,000 feet.

In conformity with this ruling, the only issue submitted to the jury was the question of the reasonable cost of drilling an oil well on the property, 3,000 feet in depth, on or before December 15, 1925. In answer to this question the jury found the cost of such well would have been $30,000. Upon the return of this verdict, judgment was rendered in favor of plaintiffs for $55,000.

The uncontroverted evidence shows the execution of the contract and assignment before set out, the payment of the $2,000 by appellant, the delivery of the abstracts by the appellees, and the examination and approval by appellant's attorneys of the title to the land covered by the leases, the making by appellant of seismographic tests of the lands in accordance with the provisions of the contract, the negative result of these tests, and the decision of appellant not to complete the purchase of the leases. These tests were made in July, 1925.

In August or September, 1925, in response to an inquiry by them, appellees were told by Mr. Deussen, the president of appellant company, that the tests showed nothing, and that appellant intended to surrender the leases, and that he (Deussen) was surprised to know that the leases had not been reassigned. No further inquiry was made by appellees in regard to a reassignment of the leases until September 19, 1925, when appellee Dunn wrote appellant the following letter:

"The four (4) months' period referred to in said contract expired on the 15th day of September, 1925, and we have not yet received the release called for in the last paragraph of section 6 above quoted. We therefore write you to let us have at once your check payable to our order in the sum of $25,000, and that within 90 days from the 15th day of September, 1925, you commence operations for the drilling of a test well for oil and gas mining purposes in the lands described in said lease contract, and otherwise perform your contract with us as set out in the above quotation from the contract, and any other provisions of the contract."

On September 22, 1925, appellant wrote a letter to Mr. P. S. Moore, a representative of appellees, stating that it was attaching to the letter a reassignment of the leases, and, if appellees so desired, would return them the assignment executed by them, which had not been placed on record. The reassignment of the leases mentioned in the letter were not attached nor inclosed therein, but were inclosed in a letter written appellees on September 24, 1925, in which it is stated that the failure to inclose them in the former letter was an oversight. On September 25, 1925, appellees wrote appellant, declining to accept a reassignment of the leases, and on November 10, 1925, filed this suit seeking to recover as the purchase price of the leases the $25,000 and the costs of drilling the well, as provided in the contract.

We agree with appellant in its contention that under the pleadings and undisputed evidence the trial court should have granted its request for an instructed verdict in its favor.

The contract upon which appellees' suit is based is plain and unambiguous in its language, and can only be construed as an executory contract for the sale of the leases by which appellant was given four months in which to investigate the oil possibilities of the land covered by the leases and determine whether or not it desired to purchase the leases upon the terms stated in the contract. The undisputed evidence shows that, before the expiration of the four months, after due investigation, it elected not to purchase the lease and so informed appellees. The assignment of the leases executed by appellee to appellant is in form a present conveyance of the title to the leases, but it contains the express provisions that such assignment is subject to all the terms, conditions, covenants, and agreements set forth in the contract executed by the parties contemporaneously with the execution of the assignment. Under a

cardinal rule of construction, the two instruments must be taken together and construed as one, and, when this is done, no other conclusion can be reached than that the parties did not intend that the assignment should vest any present title in appellant, but such title could only be acquired by appellant by compliance on its part with the terms and conditions of the contract.

The theory upon which appellees' suit is based is that the contract should be construed as a contract of purchase by which the title passed to appellant, with right in appellant, at any time before the expiration of four months, to rescind the contract by reassigning the property, and, having lost this right by its failure to reassign the leases within the four months, appellant must keep the property and pay the purchase price stipulated in the contract. This construction of the instrument is in direct conflict with its express provision that after the party of the second part (appellant) "shall have completed its geological survey of the lands above described, as hereinabove provided for, and on or before four months from the date hereof, party of the second part shall have the right, privilege and option to elect whether or not it will retain the ownership of said oil and gas mining leases; and, in the event that party of the second part should elect to retain the said oil and gas mining leases, then, in that event, party of the second part agrees to pay to parties of the first part the sum of twenty-five thousand and no/100 ($25,000.00) dollars cash in addition to the two thousand and no/100 ($2,000.00) dollars cash consideration hereinbefore specified; and, in addition to the payment of the said twenty-five thousand and no/100 ($25,000.00) dollars cash, party of the second part agrees that it will, on or before ninety (90) days after the expiration of the four (4) months' period above specified, commence operations for the drilling of a test well for oil and gas mining purposes on the lands above described, and drill said test well with due diligence and dispatch, and without unnecessary delay, to a depth of at least three thousand (3,000) feet, unless cap rock or salt is encountered at a lesser depth in the said test well, or unless oil or gas is found in paying quantities in said test well at a lesser depth."

The contract in this case is, we think, distinguishable from the contract construed in the case of Guss v. Nelson, 200 U. S. 298, 26 S. Ct. 260, 50 L. Ed. 489. The agreement in that case, which was executed on May 28, 1900, provided that Nelson would procure and turn over to Guss and named parties 25 per cent. of the capital stock of several named corporations, and that upon delivery of the stock, Guss and associates would pay him $500. It was further provided in the agreement as follows:

"The $500 is to be considered an option on all said property until the 4th day of March, 1901. At that date the above-named parties are to pay to Nelson an additional sum of $4,500 (four thousand five hundred dollars), or in lieu thereof to turn back to said Nelson all the property delivered by him."

Nelson delivered the stock in accordance with his contract, and, the purchasers having failed to return the stock within the time specified in the agreement, Nelson sued for recovery of the $4,500 balance of the agreed purchase price. The Supreme Court of the United States upheld a recovery by Nelson on the ground that the title to the stock passed by its delivery, and the only option given by the contract was an option to purchasers to rescind the sale by redelivery of the stock on or before March 1, 1901. In discussing the question, the court say:

"An option to purchase if he liked is essentially different from an option to return a purchase if he should not like. In one case the title will not pass until the option is determined; in the other the property passes at once, subject to the right to rescind and return.

"In the contract before us, while an option running until the 4th of March, 1901, is given, for which $500 is to be paid, the stipulation for such option is followed by this: 'At that date the above-named parties are to pay to Nelson an additional sum of $4,500.00 (four thousand five hundred dollars), or in lieu thereof, to turn back to said Nelson all the property delivered by him.' Here is an absolute promise on the part of plaintiffs in error to pay an additional sum of $4,500 at a specified date, or in lieu thereof to turn back the property. They did not return the property. The amount to be paid and the time of payment are expressly named, and that stipulation in the contract is as significant and binding as any other. It shows that the option given is an option to return, and that if it is not exercised at the time named the sale is complete, and the promise to pay the balance of the purchase price becomes absolute. This construction of the contract is reinforced by the fact that not only was the stock to be delivered to the plaintiffs in error, but also Nelson agreed to give, and did give, his proxy as director in each of the companies, so that the possession of the stock and all the rights which attached to it passed to the plaintiffs in error, to be exercised by them subject to the right at any time before the 4th of March to return the property. Haskins v. Dern, 19 Utah, 89 [56 P. 953], is directly in point.

"We see no error in the ruling of the Supreme Court of Oklahoma, and its judgment is affirmed."

The title to stock in a corporation, which is personal property, can pass by delivery, and Guss or his associates received the stock and, as shown by the opinion, were also invested with the incidental rights of ownership. The sale was complete and the only option they had was to rescind the sale on or before March 1, 1901, by returning the stock.

As we construe the contract in this case, the title to the leases did not pass by the as-

signment and contract; but the express provision of the contract would only pass the title if appellant on or before the expiration of the four months elected to purchase the property and paid appellees the $25,000 stipulated in the contract. It would hardly be contended that if oil had been discovered on the property after the expiration of the four months, appellant could have held title thereto by thereafter paying the $25,000 and proceeding to drill a well in accordance with the provisions of the contract. It seems clear to us that title to these leases did not pass by the execution of the contract and that the negligent failure of appellant to comply with its covenant to reassign the leases cannot have the effect of binding it to a contract of purchase which it never intended to make and which by the express terms of its contract it could only have completed by electing so to do within the time stated in the contract and paying the appellees the agreed purchase price.

It follows from these conclusions that the judgment of the trial court should be reversed, and, there being neither pleading or evidence raising any issue of damages to appellees by reason of the breach by appellant of its covenant to reassign the leases, judgment will be here rendered in favor of appellant.

Reversed and rendered.

### On Motion for Rehearing.

PER CURIAM. Rehearing denied.

GRAVES, J. Expressing after reconsideration merely individual conclusions, it seems to me that two things must be found to follow from the state of the record in this cause:

(1) That the effect of the contracts, considered as an entirety, is to evidence a mutual intention between the parties to thereby engage in a joint enterprise, the outcome of which through seismographical and torsion-balance explorations was alone to determine their several interests under the leases, and that the overriding royalty provisions in paragraph 7 thereof concerning additional lands make that purpose plain; that being true, our original conclusion was correct, whether or not any of the criticisms of it in the motion for rehearing are well taken.

(2) That the undisputed evidence discloses that, shortly after the failure of these tests of the land, and before the expiration of the four months' period on September 15, 1925, appellant through its president advised appellees of such failure and of its intention to surrender the leases and make the stipulated reassignment thereof; this amounted to a clear election not to complete the transac-

tion, and should in equity relieve appellant of the burden of the contract.

I have therefore concurred in the overruling of the motion.